DOCKET NO. 23-55166

# *In the* United States Court of Appeals *for the* Ninth Circuit

**WILLIAMS & COCHRANE, LLP**,

*Plaintiff & Appellant,*

*v.*

**SHARON ROSETTE**; **ROSETTE, LLP**; **ROSETTE & ASSOCIATES, PC**; *et al.,*

*Defendants & Appellees.*

_____

**On Appeal from the United States District Court for the Southern District of California**

**No. 17-01436**

**The Honorable Robert Huie, United States District Judge**

## APPELLANT WILLIAMS & COCHRANE'S OPENING BRIEF ON APPEAL

## [FRAP 28 & CIRCUIT RULES 28.1-28.2]

Michelle Carr
38 S. Meredith Ave., No. 3
Pasadena, California 91106
T: (619) 772-0655
*Attorney for Appellant*
*Williams & Cochrane, LLP*

Cheryl A. Williams
Kevin M. Cochrane
Williams & Cochrane, LLP
28581 Old Town Front Street
Temecula, California 92590
T/F: (619) 793-4809
*Attorneys for Appellant*
*Williams & Cochrane, LLP*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ………………………………………………iii

INTRODUCTION ………………………………………………………1

STATEMENT OF JURISDICTION ………………………………………..8

STATEMENT OF ISSUES ………………………………………………8

STATEMENT OF CASE …………………………………………………9

    A.    LEGAL AND FACTUAL BACKGROUND …………………………………9
        1.    Indian Gaming Regulatory Act ……………………………...9
        2.    Compacting in California …………………………………..10
        3.    Pauma ……………………………………………………...11
        4.    Quechan …………………………………………………...14

    B.    PROCEDURAL HISTORY……………………………………………18
        1.    Rosette's Motion to Dismiss (Declarations) ……………………..18
            a.    Cienfuegos Declaration …………………………………18
            b.    Rosette/Escalanti/White Declarations …………………...19
        2.    Discovery (Privilege Logs) ………………………………………21
        3.    Rulings on Privilege …………………………………………22
        4.    Rosette's Summary Judgment Motion (Supp'l Declarations) …….23
        5.    Ruling on Summary Judgment …………………………………24
        6.    Rosette's Motion to Substitute …………………………………25
        7.    Ruling on Motion to Substitute …………………………………25

SUMMARY OF ARGUMENT ……………………………………………26

STANDARD OF REVIEW ………………………………………………..30

ARGUMENT ……………………………………………………………30

    I.    THE DISTRICT COURT APPLIED THE WRONG LEGAL STANDARD BY
        REQUIRING WILLIAMS & COCHRANE TO SHOW PROXIMATE CAUS-
        ATION UNDER THE LANHAM ACT'S FALSE ADVERTISING TEST BY
        PROVING WHAT ACTUALLY HAPPENED WITH SPECIFIC CUSTOMERS
        RATHER THAN WHAT WAS LIKELY TO HAPPEN IN THE RELEVANT

        MARKETPLACE MORE GENERALLY ……………………………………… 30
        A.      Appropriate Audience …………………………………………..31
        B.      Application in Law Firm Cases…………………………………. 32
        C.      Expert Testimony of Tribal Attorney George Forman ………….35
        D.      Expert Testimony of Tribal Leader Anthony Miranda …………. 38

II.     THE DISTRICT COURT APPLIED THE WRONG LEGAL STANDARD BY
       ALLOWING THE DEFENDANTS TO SHIELD EVIDENCE OF HOW ONE
       PARTICULAR CUSTOMER REACTED TO THE FALSE ADVERTISEMENT
       IN THIS FEDERAL QUESTION CASE ON THE BASIS OF STATE PRIVI-
       LEGE LAW …………………………………………………………...40
        A.      Appropriate Privilege Law ………………………………... 40
        B.      Subsequent District of Arizona Order …………………………..42
        C.      Subsequent Southern District of California Order ……………....43
        D.      Subsequent Orders from Other Ninth Circuit Courts ………….. 44

III.    THE DISTRICT COURT COMMITTED A LEGAL ERROR BY ADDRESS-
       ING CAUSATION WITHOUT FIRST CONSIDERING THE VERACITY OF
       THE ADVERTISEMENT AT ISSUE SO AS TO AVOID APPLYING THE
       PRESUMPTION FRAMEWORK OF THE LANHAM ACT ……………………46
        A.      Appropriate Presumptions ………………………………... 46
        B.      Expert Testimony of Grammarian and Legal Lexicographer
               Bryan A. Garner ……………………………………………...48

IV.    WILLIAMS & COCHRANE REQUESTS THE MERITS PANEL TO RETAIN
       JURISDICTION OVER ANY SUBSEQUENT PETITIONS OR APPEALS ………..51

CONCLUSION …………………………………………………………… 51

CERTIFICATE OF COMPLIANCE………………………………………… 53

# TABLE OF AUTHORITIES

**CASES**

*Adams v. Watson*,
10 F.3d 915 (1st Cir. 1993) …………………………………………….32

*Agster v. Maricopa County,*
422 F.3d 836 (9th Cir. 2005) …………………………………22, 28, 41, 42, 44

*Bennet v. Zydron*,
2017 U.S. Dist. Lexis 154692 (E.D. Va. 2017) …………………………...32, 33

*Bennet v. Zydron*,
2017 U.S. Dist. Lexis 154359 (E.D. Va. 2017) …………………………...32, 33

*Brave Law Firm, LLC v. Truck Accident Lawyers Grp., Inc.*,
2019 U.S. Dist. Lexis 79275 (D. Kan. 2019) ………………………………..34, 35

*Burke v. Basil*,
2021 U.S. Dist. Lexis 227534 (C.D. Cal. 2021) …………………………45

*Cabazon Band of Mission Indians v. Wilson*,
124 F.3d 1050 (9th Cir. 1997) …………………………………………...27, 36

*Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. California*,
618 F.3d 1066 (9th Cir. 2010) ……………………………………………..27

*Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. California*,
629 F. Supp. 2d 1091 (E.D. Cal. 1096) …………………………………………10

*California v. Cabazon*,
480 U.S. 202 (1987) ……………………………………………..27, 35

*Chaverri v. Platinum LED Lights LLC*,
2022 U.S. Dist. Lexis 110711 (D. Ariz. 2022) …………………………..29

*Clark v. City of Los Angeles*,
2021 U.S. Dist. Lexis 199185 (C.D. Cal. 2021) …………………………45

///

*Conyers v. Cano,*
    2020 U.S. Dist. Lexis 246995 (C.D. Cal. 2020) ……………………………45

*EpicentRx, Inc. v. Carter,*
    2020 U.S. Dist. Lexis 195231 (S.D. Cal. 2020) …………………………28, 43, 44

*Fisher & Paykel Healthcare, Ltd. v. Flexicare Inc.,*
    2020 U.S. Dist. Lexis 210910 (C.D. Cal. 2020) ……………………………45

*Garcia v. County of Stanislaud,*
    2022 U.S. Dist. Lexis 166453 (E.D. Cal. 2022) ……………………………45

*Hajihassani v. Encore Flight Corp.,*
    2023 U.S. Dist. Lexis 30700 (C.D. Cal. 2023) ……………………………..45

*Hancock v. Hobbs,*
    967 F.2d 462 (11th Cir. 1992) …………………………………………...28, 40

*Ikuno v. Yip,*
    916 F.2d 306 (9th Cir. 1990) …………………………………………...30

*In re Indian Gaming Related Cases,*
    331 F.3d 1094 (9th Cir. 2003) …………………………………………...9

*Larry Pitt & Assocs v. Lundy Law, LLP,*
    2013 U.S. Dist. Lexis 174607 (E.D. Pa. 2013) ……………………………34

*Lopez v. Smith,*
    203 F.3d 1122 (9th Cir. 2000) ……………………………………………30

*Mascarenas v. Boyd,*
    2023 U.S. Dist. Lexis 15601 (C.D. Cal. 2023) ……………………………..45

*Olfati v. City of Sacramento,*
    2023 U.S. Dist. Lexis 22201 (E.D. Cal. 2023) ……………………………..45

*Pauma Band of Luiseno Mission Indians of Pauma & Yuima Reservation v. California,*
    813 F.3d 1155 (9th Cir. 2015) ……………………………………………11

*Perez v. DirecTV Grp. Holdings,*
    2020 U.S. Dist. Lexis 259346 (C.D. Cal. 2020) ……………………………45

*Porter v. Ollison*,
    620 F.3d 952 (9th Cir. 2010) …………………………………………...51

*REX v. Zillow Inc.*,
    2023 U.S. Dist. Lexis 136075 (W.D. Wash. 2023) …………………………....31

*Skye Orthobiologics, LLC v. CTM Biomedical, LLC*,
    2022 U.S. Dist. Lexis 141060 (C.D. Cal. 2022) …………………………45

*Southern Cal. Hous. Rights Ctr. v. K3 Holdings, LLC*,
    2022 U.S. Dist. Lexis 219198 (C.D. Cal. 2022) …………………………45

*Southland Sod Farms v. Stover Seed Co.*,
    108 F.3d 1134 (9th Cir. 1997) …………………………………………..29, 31, 47

*Swan v. Miss Beau Mode, Inc.*,
    566 F. Supp. 3d 1048 (D. Or. 2021) ………………………………………45

*Sweet v. City of Mesa*,
    2022 U.S. Dist. Lexis 19848 (D. Ariz. 2022) …………………………………...45

*ThermoLife Int'l, LLC v. Gaspari Nutrition Inc.*,
    648 F. App'x 609 (9th Cir. 2016) ………………………………………48

*TrafficSchool.com, Inc. v. Edriver Inc.*,
    653 F.3d 820 (9th Cir. 2011) …………………………………29, 31, 32, 47, 48

*U-Haul Int'l, Inc. v. Jartran, Inc.*,
    681 F.2d 1159 (9th Cir. 1982) ………………………………………47

*Warner Cable, Inc. v. DirecTV, Inc.*,
    497 F.3d 144 (2d Cir. 2007) …………………………………………...47, 48

*Williams & Cochrane, LLP v. REDW LLC*,
    2020 U.S. Dist. Lexis 138296 (D. Ariz. 2020) …………………………28, 42

*Wisk Aero, LLC v. Archer Aviation, Inc.*,
    2023 U.S. Dist. Lexis 103780 (N.D. Cal. 2023) …………………………...45

*World Nutrition Inc. v. Advanced Enzymes USA*,
    2023 U.S. Dist. Lexis 107599 (D. Ariz. 2023) ……………………………..29

**STATUTES**

Indian Gaming Regulatory Act (25 U.S.C. § 2701 *et seq.*)
    *generally* ............................................................................1, 2, 6, 9, 36
    § 2703 ...............................................................................................9
    § 2710 ...............................................................................................9
    § 2710(d)(3)(C) .................................................................................9
    § 2710(d)(3)(C)(iii) .........................................................................2
    § 2710(d)(4) .....................................................................................9

Judiciary and Judicial Procedure (28 U.S.C. § 1 *et seq.*)
    § 1291 ...............................................................................................8
    § 1331 ...............................................................................................8
    § 1367(a) .....................................................................................28, 43

Lanham Act (15 U.S.C. § 1051 *et seq.*)
    *generally* ......................4, 5, 6, 7, 8, 17, 18, 24, 26, 27, 29, 30, 31, 40, 46, 47, 51

Racketeer Influenced & Corrupt Organization Act (18 U.S.C. § 1961 *et seq.*)
    *generally* ..........................................................................................1

California Evidence Code
    § 900 ..........................................................................................22, 41

**OTHER AUTHORITIES**

Bryan A. Garner, *The Elements of Legal Style* (2d ed. 2002)
    p. 99 ...............................................................................................50
    p. 100 .............................................................................................50

Webster's New Int'l Dictionary (3d ed. 2002)
    p. 1322 ...........................................................................................50

## INTRODUCTION

Plaintiff-Appellant Williams & Cochrane, LLP ("Williams & Cochrane" or "Firm") is a highly-accomplished law firm that specializes in federal Indian law. By the time the Court reads this brief, it will have received a favorable judgment and a ten-million-dollar-plus damages award under the Racketeer Influenced & Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, against two in-house professionals for engaging in a years-long conspiracy to steal money from an Indian tribe.[1] It will have also prevailed in two suits alleging that the State of California negotiated in bad faith for tribal/state gaming compacts under the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2701 *et seq.* With that said, arguably its biggest achievement was successfully litigating a lawsuit brought by the Pauma Band of Mission Indians against the State of California to undo an amended gaming compact under IGRA that was procured by material misrepresentations and resulted in the payment of $36.2 million in unnecessary "revenue sharing." *See Pauma Band of Mission Indians v. California*, No. 09-01955 (S.D. Cal. filed on Sept. 4, 2009) ("*Pauma I*"). This was a hard-fought dispute, and one that lasted more than seven years. It had all the procedural components one would expect in a case with so much at stake, from a motion for preliminary injunction, to an interlocutory appeal, to discovery, to summary judgment, to an appeal to this Court, and to competing petitions for writ of certiorari to the Supreme Court of the United States. *See, e.g., Pauma*

---

[1] The nature of the actions underlying this case precludes Williams & Cochrane from supplying any further information about these lawsuits.

*Band of Mission Indians v. California*, No. 15-1291 (U.S. 2016); *California v. Pauma Band of Mission Indians*, No. 15-1185 (U.S. 2016); *Pauma Band of Mission Indians v. California*, No. 14-56104 (9th Cir. 2015). The attorneys of Williams & Cochrane represented Pauma throughout all of this, and wrapped up the representation in the fall of 2016 shortly after the State of California cut Pauma a check for $36.3 million to pay restitution for the monies the tribe should have never paid under its then-rescinded amended gaming compact.

This case concerns what happened next. The payment of the $36.3 million received quite a bit of publicity around California, and the chief executive officer for the casino operated by a tribe located on the California/Arizona border known as the Quechan Tribe of the Fort Yuma Indian Reservation ("Quechan") read an article on the topic by the Sacramento Bee and immediately recommended that the tribal council reach out to Williams & Cochrane to see if the Firm could also undo Quechan's amended gaming compact and thus create a "material change in [monetary] transfers to the tribe." 3-ER-0555. What followed afterwards is that Williams & Cochrane executed a largely contingency-based fee agreement with Quechan at the tribe's behest and commenced negotiations with the State of California. 3-ER-0557. Over the next eight months, Williams & Cochrane was able to negotiate a replacement compact for Quechan's amended gaming compact that eliminated all revenue sharing aside from what was "necessary to defray the costs of regulat[ion]" under Section 2710(d)(3)(C)(iii) of IGRA, and even did such other things as increase the total number of casinos Quechan could

operate from two (2) to three (3) and the number of permitted slot machines by almost fifty percent (50%). 3-ER-0605; 3-ER-0616. Between June 14th and 15th, 2017, a partner with Williams & Cochrane named Cheryl A. Williams communicated by phone and text with both the casino chief executive officer mentioned above and the vice president of the tribe that an agreement in principle had been reached with the State for the replacement compact. 3-ER-0585-586. Curiously, the very next morning, the chairman and one other member of the Quechan tribal council were meeting in-person with a competing attorney named Robert Rosette about the work being done by Williams & Cochrane on the successor compact. 2-ER-0366. Just ten days later, the tribal chairman sent Williams & Cochrane a letter explaining the Firm was terminated effective immediately and that Quechan would pay neither the contingency fee agreed upon in the attorney/client fee agreement nor a reasonable fee in lieu thereof. 3-ER-0713-15. The June 26th letter then went on to warn Williams & Cochrane that it could not contact anyone affiliated with the tribe about what just happened, and that it had to simply turn over the final draft compact to Mr. Rosette and walk away from the situation. 3-ER-0714. To help ensure Williams & Cochrane did just that, the June 26th letter threatened that Quechan "strongly advises you against pressing your luck any further out of concern for the reputation of your firm in Indian Country and in the State of California." 3-ER-0714.

The mention of Mr. Rosette as being the replacement attorney in the June 26th letter led the partners of Williams & Cochrane to do some investigation. What they soon

found is that Mr. Rosette was representing on his own website that he – not Williams & Cochrane – "successfully litigated a case saving the Pauma Band of Luiseno Mission Indians over $100 Million in Compact payments allegedly owed to the State of California against then Governor Schwarzenegger." 3-ER-0553. If this were not enough, during the pleading stage of this case, opposing counsel also filed a declaration from the longtime executive assistant at Mr. Rosette's law firm who had overseen the "records related to the firm's business development and marketing efforts" for the prior ten years to explain "Rosette, LLP often commissions the printing and distribution of marketing brochures," with the representative copy of such brochures containing the very same advertisement that Mr. Rosette "successfully litigated" the *Pauma* case. 3-ER-0529; 3-ER-0538.

Within weeks of Quechan's repudiation of the attorney/client fee agreement, Williams & Cochrane filed suit in the United States District Court for the Southern District of California alleging, in part, that Mr. Rosette and his law firm ("Rosette Defendants") violated the Lanham Act, 15 U.S.C. § 1051 *et seq.*, in light of their false advertisements about the *Pauma* suit. During the pleading stage of the case, counsel for the Rosette Defendants filed the aforesaid declaration from the executive assistant about the Rosette firm's marketing efforts as well as three (3) other declarations from the alleged principals involved in the surreptitious meeting that resulted in Williams & Cochrane ouster – one apiece from Mr. Rosette, Quechan's president Keeny Escalanti, and Quechan's councilmember Mark William White II. 2-ER-0364-80; 3-ER-0528-49.

4

Each one of these three declarations testified as to what was or was not said at the meeting, both as it relates to Mr. Rosette's involvement in the *Pauma* litigation and Williams & Cochrane more generally. *See, e.g.*, 2-ER-0366-68.

Filing these declarations should have put opposing counsel on notice that the three individuals would be subject to discovery when the process started before the district court. However, when the time arrived, counsel for the Rosette Defendants initially produced just "31 documents totaling 211 pages." 2-ER-0334. What it was willing to turn over was a pittance compared to what it sought to shield, as nearly four months later and just weeks before the end of fact discovery, counsel for the Rosette Defendants finally produced its client's privilege log – one spanning ninety-eight (98) pages and housing something in the realm of nine hundred and seventy-five (975) documents. 2-ER-0223-0320. At virtually the same time, counsel for the Quechan tribe produced a thirteen (13) page privilege log for its own client that listed another two hundred-plus (200+) documents. 2-ER-0321-33. This blanket invocation of attorney-client privilege to suppress the relevant evidence led Williams & Cochrane to file a discovery dispute with the magistrate judge and argue that none of these materials should be shielded from discovery under federal privilege law – the body of law that applies in any federal question case, including one involving false advertising under the Lanham Act. 1-ER-0063-68. In an unexpected turn of events, the magistrate judge informed the parties that he was going to apply state privilege law in the federal question case, a decision the first district judge assigned to this case subsequently upheld despite

5

acknowledging that the "majority" view is that federal law should apply in such circumstances. 1-ER-0059; 1-ER-0072-73. In the aftermath of this order permitting the shielding of evidence, the Rosette Defendants would file three (3) more declarations on summary judgment to once again testify as to what was or was not said during the preliminary meetings in which Quechan was listening to Mr. Rosette's pitch about his qualifications for finishing off a high-stakes dispute about an amended gaming compact under IGRA. 1-ER-0204-0222. Ultimately, the fifth district judge assigned to this case granted summary judgment in favor of the Rosette Defendants, holding that Williams & Cochrane failed to show an injury because it had no evidence of what actually transpired behind the scenes at Quechan – the breached contract notwithstanding. 1-ER-0036. In other words, the analysis under the Lanham Act in this attorney-on-attorney context had morphed from looking at how the relevant marketplace would receive an advertisement of that nature to how one specific customer would react to such, assuming the contemporaneous evidence on that point would be produced.

There is an added wrinkle in this case that will likely be a subject of conversation during the appeal and which the Court should be aware of at the outset. Mr. Rosette passed away during the summary judgment proceedings before the district court. 2-ER-0161-63. Normally, a tragic event like this would bring about the end of a dispute. However, this case is anything but normal. With Rosette, LLP trying to hold on to Quechan as a client, what happened instead is that counsel for the Rosette Defendants moved to substitute in Mr. Rosette's widow Sharon for the decedent to effectuate two

ends. 2-ER-0161-63. The first of these was to use the specter of substitution and continued litigation as a means of hindering post-summary judgment settlement talks between Williams & Cochrane and Quechan, with opposing counsel even sending an e-mail about imminent substitution during the intermission in the actual settlement conference. 2-ER-0169; 2-ER-0176. The second was to use this new defendant as the means to move for attorney's fees before the district court. 2-ER-0161-63. The fifth district judge who presided over summary judgment granted substitution but nevertheless cautioned in his ultimate order that it would "address whether the Rosette Defendants in fact engaged in false commercial advertising" should they try and move for attorney's fees. 2-ER-0159-60. In other words, the district judge tacitly acknowledged that it was dealing with a literally false commercial advertisement made by a direct competitor in a niche market, but that it would not find any connection between such advertisement and the suffered harm. This decision fundamentally misconstrues the innerworkings of the burden-shifting framework of the Lanham Act. The district judge is correct in one respect though: the online and print advertisements by the Rosette Defendants asserting that Mr. Rosette "successfully litigated" the *Pauma* case are indeed literally false, and this Court should thus reverse the decision below for any of the three reasons set forth herein and remand the matter so the case can go to trial.

///

///

## STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1051 *et seq*. The district court entered judgment on January 23, 2023. 1-ER-0002. Plaintiff filed a timely Notice of Appeal on February 20, 2023. 4-ER-0885-88. This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291

## STATEMENT OF ISSUES

1. Whether the district court misapplied the substantive law by requiring causation under the Lanham Act's false advertising test to be proven with actual evidence of what happened with a particular customer and not how the relevant marketplace would react more generally.

2. In the event the causation analysis of the Lanham Act's false advertising test indeed hones in on particular customers, whether the district court misapplied the substantive law by using state privilege law to resolve privilege issues in this federal question case.

3. Regardless of the appropriate audience, whether the district court misapplied the substantive law by focusing solely upon the causation element of the Lanham Act's false advertising test without first addressing the antecedent question of the literal falsity of the advertisement made by the direct competitor so as to avoid applying the presumption framework under the statute.

///

///

8

## STATEMENT OF CASE

### A. LEGAL AND FACTUAL BACKGROUND

#### 1. Indian Gaming Regulatory Act

IGRA was enacted by the United States Congress in 1988 to create a regulatory structure for the various classes of gaming that may be conducted by Indian tribes. *See* 25 U.S.C. § 2701 *et seq.* The classes range in number from one to three, with the amount of regulation increasing alongside these numbers. *See* 25 U.S.C. § 2703. Class III encompasses most of the forms of gambling typically associated with Las Vegas and Atlantic City casinos and is the most heavily regulated class, having to be done pursuant to a compact that the tribe negotiates with the surrounding state. *See* 25 U.S.C. § 2710. This compact is the vehicle through which a state can civilly regulate the class III activities at the tribal casino, with the types of regulations it may seek during the negotiations set forth in Section 2710(d)(3)(C). *See* 25 U.S.C. § 2710(d)(3)(C)(i)-(vii). Despite this allowance, there are many things that a state cannot do during the course of negotiations, the most explicit example of which being attempting "to impose any tax, fee, charge, or other assessment upon an Indian tribe… to engage in a class III activity." 25 U.S.C. § 2710(d)(4). The many states with Indian reservations located inside their borders quickly invented a way around this prohibition on taxation by demanding that tribes pay "revenue sharing" in order to get a compact. *See, e.g., In re Indian Gaming Related Cases*, 331 F.3d 1094, 11110 (9th Cir. 2003) ("*Coyote Valley II*"). The federal courts sanctioned this idea under the line of thinking that a state can get something it otherwise

isn't entitled to by giving something it otherwise isn't required to, with that something often being "exclusivity" over the types of class III games that are at the center of the negotiations. *See id.* at 1112.

### 2. Compacting in California

The original class III gaming compacts did not come about in the State of California until the fall of 1999, when the administration of then-Governor Gray Davis negotiated a form compact ("1999 Compact") with approximately fifty-seven Indian tribes. *Id.* at 1104. The standard terms of this model compact imposed modest amounts of revenue sharing on incipient gaming tribes, simply requiring them to pay annual fees ranging from $900 to $4,350 into the Revenue Sharing Trust Fund ("RSTF") on machines over certain thresholds. As for those machines, the terms of the 1999 Compact allowed signatory tribes to operate up to 2,000 of them subject to the availability of machine-specific licenses within an aggregate pool. *See Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. California*, 629 F. Supp. 2d 1091, 1096 (E.D. Cal. 1096) ("*Colusa I*"). Unfortunately, the equation set forth in the terms of the 1999 Compact for calculating the total number of available licenses was not clear on its face and required tribes to know certain private or proprietary information like the number of non-compact tribes and the number of gaming devices in operation by tribes as of September 1, 1999. *Id.* at 1109. The entity ultimately responsible for overseeing the administration of the license pool – the California Gambling Control Commission ("CGCC") – had access to this information and finally interpreted the formula three years into the life of the

10

1999 Compacts, holding that the pool allowed for a total of 32,151 gaming device licenses. *Id.* at 1112. This limit was reached soon thereafter during a license draw in December 2003, after which the CGCC informed tribes that they would have to enter into renegotiations with the State of California in order to obtain the permission to operate any further slot machines. *See, e.g., id.* at 1099.

### 3. Pauma

One of the very first tribes affected by the exhaustion of the license pool was Pauma, a new gaming tribe who had recently obtained its version of the 1999 Compact and was then in discussions with Caesars about opening a resort-style casino. *See Pauma Band of Luiseno Mission Indians of Pauma & Yuima Reservation v. California*, 813 F.3d 1155, 1161-62 (9th Cir. 2015). Pauma spent the first-half of 2004 in renegotiations with the State to increase its device count up to the 2,000-machine limit of the 1999 Compact to satisfy a condition of its development plan, becoming one of five tribes to execute an amended compact during the summer of 2004 ("2004 Amendment"). *Id.* at 1161. This 2004 Amendment did provide Pauma with the right to access the full 2,000-machine allotment of the 1999 Compact, but it did so at a significant cost, increasing the revenue sharing fees of the 1999 Compact by 2,460%. *See id.* at 1162 (explaining the annual revenue sharing fees increased from $315,000 to $7.75 million). Five years later, the United States District Court for the Eastern District of California would issue a decision in which it held that the CGCC grossly miscalculated the number of licenses available under the 1999 Compacts and thereby suppressed the size of the pool by upwards of

11

10,000 licenses. *See Colusa I*, 649 F. Supp. 2d 1063. In the wake of this decision, Pauma filed a complaint with the United States District Court for the Southern District of California to extricate itself from the 2004 Amendment and the heightened revenue sharing requirements therein. *See Pauma I*, No. 09-01955 (S.D. Cal. filed on Sept. 4, 2009).

The attorneys who exclusively worked on this lawsuit for Pauma during the initial stages were Cheryl A. Williams and Kevin M. Cochrane while they were stationed at a law firm known as Rosette & Associates, PC. 4-ER-0856-57. During their brief time with this firm from 2009 to the spring of 2010, these two attorneys authored the complaint, opposed the State's motion to dismiss, filed a motion to obtain a preliminary injunction to reduce the tribe's revenue sharing obligations to the prior rates of the 1999 Compact, and argued and successfully obtained the relief requested in the foregoing motion for preliminary injunction. *See Pauma I*, Dkt. No. 42 (S.D. Cal. Apr. 5, 2010). In May 2010, these two attorneys left Rosette & Associates for reasons wholly unrelated to the *Pauma* case, and the remaining attorneys at the firm were tasked with defending the preliminary injunction in the face of an interlocutory appeal filed by the State of California. *See Pauma Band of Mission Indians v. California*, No. 10-55713 (9th Cir. filed on May 5, 2010) ("*Pauma II*"). Unfortunately, the motions panel of the Ninth Circuit granted the State of California's motion to stay the preliminary injunction in a summary order over Rosette & Associates' ineffective opposition brief. *See, e.g.*, *Pauma II*, Dkt. No. 14 (9th Cir. June 10, 2010). Shortly thereafter, Cheryl Williams and Kevin Cochrane

12

– who had gone on to form their own law firm of Williams & Cochrane – were tasked by Pauma with handling the appeal, and were able to persuade the very same motions panel to reinstate the preliminary injunction. *See*, *e.g.*, *Pauma II*, Dkt. No. 55 (9th Cir. Aug. 23, 2010). From the point of their retention during the summer of 2010 onwards, the two attorneys with Williams & Cochrane exclusively represented Pauma in its suit against the State of California. This includes amending the operative complaint during the fall of 2011 to add a claim under federal contract law for material misrepresentation. *See Pauma I*, Dkt. No. 130 (S.D. Cal. Sept. 9, 2011). It also includes obtaining the summary judgment order during the spring of 2013 in which the district judge decided the case in Pauma's favor solely on the basis of the foregoing material misrepresentation claim, awarding rescission of the 2004 Amendment and restitution of $36.3 million in connection therewith. *See Pauma I*, Dkt. No. 227 (S.D. Cal. Mar. 18, 2013). Following that, the attorneys with Williams & Cochrane also handled the consequent appeal to this Court and the cross-petitions filed by the parties with the Supreme Court of the United States. *See*, *e.g.*, *Pauma Band of Mission Indians v. California*, No. 15-1291 (U.S. 2016); *California v. Pauma Band of Mission Indians*, No. 15-1185 (U.S. 2016); *Pauma Band of Mission Indians v. California*, No. 14-56104 (9th Cir. 2015). Ultimately, the case concluded during the fall of 2016 when the State of California satisfied the monetary judgment awarded by the district court.

///

///

13

### 4. Quechan

In August of 2016, the chief executive officer of the Quechan Casino Resort named Charles Montague caught wind of a Sacramento Bee article discussing the State of California paying the judgment in *Pauma* and he consequently sent an e-mail to the tribal president in which he discussed how a *Pauma*-like strategy could get the tribe out of its own amended compact and save substantial money as a result. 3-ER-0555. Like *Pauma*, Quechan was a signatory to the 1999 Compact that executed an amendment, this time in 2006 ("2006 Amendment"). 3-ER-0575-0583. The financial terms of this 2006 Amendment were rather onerous, as they required Quechan to pay a percentage of its net win to the State that ranged from ten to twenty-five percent depending upon how well the casino performed. 3-ER-0578. What is more, the 2006 Amendment also contained a provision at Section 4.3.3(f) that allowed the State to shutter Quechan's gaming floor if the tribe fell behind in making these revenue sharing payments by sixty (60) days of more – with the consequences becoming even more severe in the face of greater delinquency. 3-ER-0580-81. With a serious financial dispute already fomenting, Williams & Cochrane entered into a largely contingency-based attorney-client fee agreement with Quechan and sought to engage in negotiations or litigation with the State of California in order to turn a potential casino closure into an entirely new compact. 3-ER-0556-64. After approximately eight months of negotiation, the attorneys of Williams & Cochrane were able to agree in principle on a replacement compact for Quechan that wiped away all revenue sharing aside from what was

14

necessary to defray the costs of regulation, and actually bettered some of the core gaming rights of the prior agreement – increasing the limit on the number of permitted casinos from two (2) to three (3) and the number of slot machines by almost fifty percent (50%). 3-ER-0605; 3-ER-0616.

Immediately after the final negotiation session between Williams & Cochrane and representatives for the Office of the Governor Edmund G. Brown, Jr., Cheryl A. Williams called the point persons with Quechan to let them know about what transpired during the meeting. 3-ER-0584-86. The vice president of Quechan memorialized this conversation in an email to other members of the tribal council late in the afternoon of June 15, 2017 in which he explained that he received a call from Cheryl Williams, who stated that an agreement in principle for a final compact had been reached during the negotiation session and it would include a "third facility" and "an additional 400 machines" on top of the twelve hundred previously agreed upon. 3-ER-0587. This June 15th email then explained that Cheryl Williams indicated it would "take an additional week or two to get the compact in place," which put the signing date for the final agreement "at the end of June or possibly the first week of July." 3-ER-0587. And yet, according to multiple declarations filed by the Rosette Defendants in this case that will be discussed later on, two members of the Quechan tribal council were in an in-person meeting with Mr. Rosette a mere eighteen (18) hours later to discuss whether he would "be interested in assisting Quechan's California [compact] negotiations." See, *e.g.*, 2-ER-0378. With the anticipated signing date for Quechan's compact less than two weeks

away, Mr. Rosette agreed to "assist" with these compact negotiations by preparing a termination letter for Quechan's president Keeny Escalanti to send to Williams & Cochrane on June 26, 2026. 3-ER-0713-15. This letter began by explaining "the Fort Yuma Quechan Indian Tribe... is terminating the services of Williams & Cochrane, LLP... effective immediately upon your receipt of this letter" and "will not pay any contingency fee or 'reasonable fee for the legal services provided in lieu' thereof." 3-ER-0713. The June 26th letter then instructed Williams & Cochrane to "direct all communications," including the final draft compact, to "Robert A. Rosette," and to not discuss the substance of the letter with "any employee, officer, or official or the Tribe or any subdivision, agency, or enterprise of the Tribe." 3-ER-0714. And, as a warning to help convince Williams & Cochrane to heed this instruction and walk away from the repudiation of the attorney/client fee agreement, the June 26th letter also included the threat that Quechan "strongly advise[s] you against pressing your luck further out of concern for the reputation of your firm in Indian Country and in the State of California." 3-ER-0714.

Just two days after sending this letter, an associate attorney with Rosette, LLP named Cecilia Zamora was already emailing a California State Senator with the aim of discussing "the legislative process for getting [Quechan's] compact ratified." 3-ER-0719. Not wanting to be pulled into some unseemly quagmire, Cheryl Williams sent the final draft compact to Rosette, LLP a few days afterwards, and Quechan and the State ultimately executed a substantively identical compact – same revenue sharing, same

16

number of casinos, same number of slot machines, same term – just two months later. 4-ER-0721-0840. The terms of this successor compact were so good and so unprecedented at the time that Quechan's president actually appeared before a Senate subcommittee a few months later to extoll the virtues of such, explaining in part that his tribe "recently negotiated a new Tribal-State Compact with Governor Edmund G. Brown" "to alleviate the financial hardship that we experienced under the 2006 Amendment," "Governor Brown's administration worked tirelessly to finalize our new compact," and that he and his tribe were very "pleased with the terms of our new compact, as it allows for an expansion of gaming devices while offering up more favorable revenue-sharing provisions for the Tribe that will allow it to improve its financial status and augment services that [the tribe] can provide its membership." 4-ER-0843-44.

In the aftermath of its unexpected termination, the partners of Williams & Cochrane reviewed the website for Mr. Rosette and discovered that it prominently advertised his lone compact experience as being that he "successfully litigated a case saving the Pauma Band of Luiseno Mission Indians over $100 Million in Compact payments allegedly owed to the State of California against then Governor Schwarzenegger." 3-ER-0550-54. Upon seeing that, Williams & Cochrane prepared a complaint for false advertising under the Lanham Act and filed it with the Southern District of California on July 17, 2017.

///

17

### B. PROCEDURAL HISTORY

#### 1. Rosette's Motion to Dismiss (Declarations)

The case was initially assigned to District Judge Gonzalo Curiel, and the Rosette Defendants quickly moved to dismiss the Lanham Act claim in Williams & Cochrane's complaint on the basis of two alternating theories. The first theory essentially contended that the Rosette website advertisement was a non-event because the firm had been making that very same representation for years, with the evidentiary support for this argument coming from a declaration from Christian Cienfuegos. 3-ER-0528-49.

#### a. Cienfuegos Declaration

According to this declaration, Christian Cienuegos was an "executive assistant at Rosette LLP" "since 2007" who for at least the "10 years" prior had "oversee[n] the maintenance of certain law firm records, including those records related to the firm's business development and market efforts." 3-ER-0529. The Cienfuegos declaration went on to explain that "Rosette, LLP often commissions the printing and distribution of marketing brochures" and "retain[s] representative copies of such brochures and other marketing materials in its records." 3-ER-0529. As proof of this, the Cienfuegos Declaration attached one such "marketing brochure" that was "maintained in the ordinary course of business at Rosette, LLP" and had been "added to Rosette LLP's shared drive on May 9, 2011" – or more than six years before the events at Quechan. 3-ER-0529. This brochure that was attached to the Cienfuegos Declaration as Exhibit 1 contained a profile of Mr. Rosette that advertised that he "successfully litigated a case

18

saving the Pauma Band of Luiseno Mission Indians over $100 Million in Compact payments allegedly owed to the State of California against then-Governor Schwarzenegger." 3-ER-0538.

### b. Rosette/Escalanti/White Declarations

The second theory put forward by the Rosette Defendants was that even if the website advertisement by Mr. Rosette was problematic, it had no impact on the situation at Quechan because the magic word "Pauma" was never uttered during Mr. Rosette's in-person overtures to the Quechan tribal council. As proof of this, the Rosette Defendants submitted three declarations from the supposed participants in the initial meetings between Mr. Rosette and Quechan – Mr. Rosette himself, Quechan president Keeny Escalanti, and Quechan councilmember Mark William White II. 2-ER-0364-80. The declaration from Mr. Rosette explained that he had an in person "breakfast meeting" with president Escalanti and councilmember White on the morning of June 16, 2017 – or roughly eighteen (18) hours after Cheryl Williams emailed the Quechan tribal council to let them know that an agreement in principle on a successor compact had been reached. 2-ER-0366. According to this declaration, the Quechan leadership asked Mr. Rosette about his "experience with California compact negotiations," with the declaration failing to detail his answer. 2-ER-0366. Again, the only compact experience advertised on the Rosette website or in the marketing brochure disclosed by the Cienfuegos Declaration was Mr. Rosette's supposed responsibility for "successfully litigat[ing]" the *Pauma* suit. 3-ER-0528-54. After this discussion about his credentials,

19

the conversation then segued right into the "Quechan leadership ask[ing]" Mr. Rosette "about [his]… willingness to represent Quechan in California if Quechan decided to terminate Williams & Cochrane" – a question that elicited an enthusiastic yes in response from Mr. Rosette. 2-ER-0367.

The other two declarations by president Escalanti and councilmember White are carbon copies of one another. They both testify that these individuals initially met with Mr. Rosette on the morning of June 16, 2017, before having at least one more meeting with him on June 19, 2017. 2-ER-0371-72. During the first meeting, these individuals also testify that they met Mr. Rosette over breakfast, and inquired of his "experience with compact negotiations in California." This time the declarations state that "Mr. Rosette indicated he had a great deal of experience in this area," though the advertised experience for such – again – begins and ends with "successfully litigat[ing]" the *Pauma* suit. 2-ER-0372. The two declarations then obliquely explain that the parties "discussed the subject in further detail" before the representatives for Quechan immediately turned to asking "whether Mr. Rosette may be interested in assisting in Quechan's California negotiations." 2-ER-0372. Ultimately, all of the foregoing declarations played a minor role at the time of their filing, with District Judge Curiel denying the Rosette Defendants motion to dismiss and thus positioning the Defendants to head into discovery with all of this testimony now public and on the docket.

///

///

20

## 2. Discovery (Privilege Logs)

The scheduling order in the case issued on October 9, 2019, with the fact discovery process to run for six-and-a-half months – starting on the foregoing date and ending on May 22, 2020. 2-ER-0334-43. Roughly a month later, on November 12, 2019, the Rosette Defendants responded to Williams & Cochrane's discovery requests with a production letter that explained they were turning over their entire production of "31 documents totaling 211 pages." 2-ER-0334. Willliams & Cochrane would then spend the ensuing months engaged in recurrent discovery disputes before the magistrate judge to get the Rosette Defendants to both produce responsive documents and provide their privilege log. A complete version of that privilege log would not come about until March 3, 2020 – or five months into the discovery process and just six-or-so weeks before the end of fact discovery. 2-ER-0223-0320. Quechan would transmit its own privilege log just slightly before this date, on February 12, 2020. 2-ER-0321-33. As for the contents of each, the privilege log by the Rosette Defendants spanned ninety-eight (98) pages and housed somewhere in the vicinity of nine-hundred-and-seventy-five documents (975), while the one for Quechan covered another thirteen (13) pages and two-hundred-plus (200+) documents. 2-ER-0223-0333. The shielding of approximately twelve-hundred documents from disclosure led Williams & Cochrane to file a discovery dispute with the magistrate judge and argue, *inter alia*, that at least *some* of these documents had to be produced under federal privilege law given the extensive declaration testimony the Rosette Defendants had already filed in the case.

### 3. Rulings on Privilege

The hearing on Williams & Cochrane's discovery dispute took place on April 16, 2020, and the issue of the appropriate body of privilege law came up right at the outset of the discussion. 1-ER-0069-72. Counsel for Williams & Cochrane echoed what the parties argued in their briefs by explaining that federal privilege law was the proper body of law to apply in a federal question case, even one involving pendent state-law claims:

> There was a 2005 case from the Ninth Circuit called *Agster v. Maricopa County* [422 F.3d 836], and it sort of dealt with the situation in which you ha[ve] a federal question claim that was joined with other pend[ent] state law claims, and I believe they held in that situation that the federal law [of] privilege applies. Usually, in that situation, what happens is you will look at federal common law [of] privilege. State law can sort of serve [in] a gap-filling capacity if it's instructive in some way, but I think that we are probably more comfortable with federal law applying, first and foremost.

1-ER-0072. Despite this argument, the magistrate judge ruled that he would strictly apply California privilege law and only find a waiver if provided for in a "statutory source under California Evidence Code 900, *et seq.*" 1-ER-0073. With that, the magistrate judge issued an order in which he preserved privilege for each and every document housed on the one-hundred-and-ten-plus pages of privilege logs under California law. 1-ER-0063-68. Williams & Cochrane filed objections with District Judge Curiel, but he too issued an order preserving privilege under California law despite acknowledging in the order that "[a] majority of federal courts have applied federal privilege law to claims of privilege in federal question actions with pendent state law claims." 1-ER-0059. This ruling enabled the Rosette Defendants to head into summary

22

judgment shielding whatever material they considered privileged about the relationship between the Rosette firm and Quechan.

### 4. Rosette's Summary Judgment Motion (Supplemental Declarations)

The summary judgment process took place during the fall of 2020. The Rosette Defendants filed a motion for summary judgment that attached three (3) more declarations concerning the origins of the Rosette-Quechan relationship despite having blocked all inquiry into this subject during discovery. 2-ER-0204-22. Like the ones filed in connection with their previous motion to dismiss, these three declarations came from Mr. Rosette, Quechan president Escalanti, and Quechan councilmember White and essentially reiterated and then embellished upon the stories they painted earlier in the case. 2-ER-0204-22. Each one of these declarations offered some variation of the testimony in Mr. Rosette's declaration where he now testified that – common sense and the Cienfuegos Declaration notwithstanding – he never provided "President Escalanti or Councilman White with my attorney biography or any Rosette marketing materials at or prior to the June 16, 2017 meeting," and in fact "did not discuss his litigation experience… Pauma, the *Pauma* Litigation, Rosette's… representation of Pauma, or Rosette's… involvement in the *Pauma* Litigation." 2-ER-0209. All of these declarations still mentioned the presentation that the Rosette Defendants made for Quechan (which was never disclosed during discovery), but at no point described the "great deal" of "experience with compact negotiations in California" that led president Escalanti and councilmember White to ask Mr. Rosette whether he wanted to take over the tribe's

23

compact dispute at the final moment. 2-ER-0209; 2-ER-0378. Faced with this, Williams & Cochrane filed its own cross-motion for summary judgment, and also moved under Federal Rule of Civil Procedure 54(d) to defer summary judgment until the Rosette Defendants produced the evidence relevant to the Lanham Act claim they had long withheld. 3-ER-0447-80.

### 5. Ruling on Summary Judgment

What followed in the aftermath of the filing of motions for summary judgment was a flurry of transfers. District Judge Curiel transferred the case to District Judge Todd Robinson on September 28, 2020. 2-ER-0189-91. On January 4, 2022, District Judge Robinson effectuated the second transfer by sending the case to District Judge Linda Lopez. 2-ER-0187-88. District Judge Lopez then transferred the case for a third time by sending it to District Judge Ruth Bermudez Montenegro on April 6, 2022. 2-ER-0184-86. On June 24, 2022, District Judge Bermudez Montenegro entered transfer order number four and handed the case over to District Judge Robert Huie. 2-ER-0182-83. Then, three months later and without a hearing, on September 27, 2022, District Judge Huie, a district judge who was four judges removed from the one that presided over discovery, issued an order on summary judgment in which he denied Williams & Cochrane's motions – including the motion for a continuance under Rule 56(d) – and granted the Rosette Defendants' motion for summary judgment on the Lanham Act claim, finding that "[Williams & Cochrane] has no evidence that the Pauma Sentence influenced the Quechan Tribe's decision" and thus cannot show "proximate causation."

24

1-ER-0035. What is more, this September 27, 2022 summary judgment order references the six (6) declarations filed by the Rosette Defendants in the case about the origins of the Quechan-Rosette relationship and for which they suppressed all associated evidence no less than twenty (20) times. 1-ER-0004-49.

### 6. Rosette's Motion to Substitute

This ruling on summary judgment resolved the claims between Williams & Cochrane and the Rosette Defendants, and the Southern District of California then set up a mandatory settlement conference on November 16, 2022 to address those that remained between the Firm and Quechan. 2-ER-0176-81. Around this time, however, Mr. Rosette passed away, and counsel for the Rosette Defendants began sending emails trying to impede settlement by raising its intention to substitute in a new defendant. 2-ER-0164-75. In one such e-mail that was actually sent during the intermission of the November 16th settlement conference, counsel for the Rosette Defendants explained that it intended to file a motion to substitute the following Monday, asking the Court to replace the decedent with his widow Sharon Rosette. 2-ER-0169. The attempted interference notwithstanding, Williams & Cochrane was able to settle its dispute with Quechan, but the Rosette Defendants nevertheless went forward with their plan and filed the motion to substitute on Monday, November 21, 2022. 2-ER-0161-63.

### 7. Ruling on Motion to Substitute

District Judge Huie issued his order on the Rosette Defendants' motion to substitute on January 5, 2023, finding "[s]ubstitution is appropriate where Sharon Rosette seeks

to be involved in further proceedings in this case, including entry of final judgment and a possible motion for attorneys' fees to be brought by the Rosette Defendants." 2-ER-0159. As for such a motion, the January 5, 2023 order went on to caution that "[t]he Court notes that its order granting summary judgment… concluded that [Williams & Cochrane] had not established causation on its false advertising claim against the Rosette Defendants, but did not address whether the Rosette Defendants in fact engaged in false commercial advertising." 2-ER-0159-60. The Southern District of California entered judgment on January 23, 2023, which Williams & Cochrane appealed by filing its notice of appeal twenty-eight days later. 1-ER-0002-03; 4-ER-0885-88. By its own terms, this notice of appeal does not extend to the January 5, 2023 order granting the substitution of Ms. Rosette. 4-ER-0886.

## SUMMARY OF ARGUMENT

1. The district court resolved a false advertising claim under the Lanham Act by requiring the plaintiff to show how that advertisement actually impacted each specific customer rather than how it would affect the marketplace more generally. Here, Williams & Cochrane submitted an expert report by a longtime tribal leader named Anthony Miranda who testified that "the statement on Mr. Rosette's website" about the *Pauma* case "would likely be an important hiring decision for a tribe such as Quechan that, like Pauma, had a Schwarzenegger-era compact requiring onerously high compact payments," and that such a tribe would not independently verify such a claim since, *inter alia*, "attorneys are bound by a certain standard of professionalism and ethics and would

26

not likely subject themselves to liability for publicly taking credit for another attorney's work." 3-ER-0518. Further, Williams & Cochrane also submitted an expert report by the preeminent Indian law attorney George Forman who has been practicing in California since 1969 and was one of if not the lead attorney on such watershed cases as *California v. Cabazon*, 480 U.S. 202 (1987); *Cabazon Band of Mission Indians v. Wilson*, 124 F.3d 1050 (9th Cir. 1997); and *Cachil Dehe Band of Wintun Indian of Colusa Indian Cmty. v. California*, 618 F.3d 1066 (9th Cir. 2010). 3-ER-0498-0503. Mr. Forman testified that Mr. Rosette's advertising materials were replete with falsehoods – including the one about the *Pauma* litigation – and this was problematic given the important role of the tribal attorney and the fact that "tribal leaders tend to take lawyers' representations of their ability and accomplishments at face value." 3-ER-0508-09. He, too, believed tribes – with whom he has worked for more than a half-century – like Quechan that were stuck with compacts with onerous revenue sharing requirements would be influenced by a false advertisement about successfully litigating a case of such magnitude and import as *Pauma*. 3-ER-0508-09; 4-ER-0874-75. Given this testimony, the Court should reverse and remand the matter so the parties can go to trial on the Lanham Act claim with the appropriate framing.

2.    The district court not only required Williams & Cochrane to show particularized harm for this federal claim, but then resolved attendant privilege issues associated with an impacted customer relationship under state – not federal – law. The uniform rule that has existed since long before the filing of the instant case is that federal privilege

law applies to resolve issues in federal question case *even if* pendent state law claims are present. *See Hancock v. Hobbs*, 967 F.2d 462, 466-67 (11th Cir. 1992) (collecting cases); *Agster v. Maricopa County*, 422 F.3d 836, 839-40 (9th Cir. 2005) ("Where there are federal question claims and pendent state law claims present, the federal law of privilege applies."). The district court took the opposite tack in this case despite reciting this very principle in the relevant order that the "majority of federal courts have applied federal privilege law to claims of privilege in federal question actions with pendent state law claims." 1-ER-0057. The district court's decision to *not* rely on federal privilege law in a federal question case finds no support in caw law that has come out since. The United States District Court for the District of Arizona, which was tasked with resolving a dispute over a third-party subpoena in this very action, disagreed with the ruling of the district court and rightly applied federal privilege law to resolve the dispute before it in this federal question case. *See Williams & Cochrane, LLP v. REDW LLC*, 2020 U.S. Dist. Lexis 138296, *13 (D. Ariz. 2020) ("*REDW LLC*") (citing 28 U.S.C. § 1367(a)). The Southern District of California itself declined to follow the district court's order just six months later, citing it multiple times but electing instead to abide by "the majority approach and apply federal privilege law." *EpicentRx, Inc. v. Carter*, 2020 U.S. Dist. Lexis 195231, *10 (S.D. Cal. 2020). Not only that, but seemingly every locatable published and nonpublished order issued by a court within the Ninth Circuit following the release of the order below has hewed to the majority approach and binding Ninth Circuit authority by applying federal privilege law in federal question cases. *See* Argument § II.

28

Given this, the Court should reverse the order below and remand this case to the district court with instructions to analyze the privilege logs in light of federal privilege law so the case can proceed to trial without delay.

3. The district court analyzed the false advertising claim under the Lanham Act by beginning at the end and working its way backwards. In other words, it looked at causation without actually considering the statement that would cause the alleged injury. Yet, the degree of falsity in an advertisement is an important consideration to the ensuing elements in the Lanham Act test (including causation), and is supposed to mark the beginning of the analysis. One of the reasons for this is that a literally false statement creates presumptions of deception and materiality. *See World Nutrition Inc. v. Advanced Enzymes USA*, 2023 U.S. Dist. Lexis 107599, *22 (D. Ariz. 2023) (citing *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139-40 (9th Cir. 1997)). A literal false statement by a direct competitor in a small market does more than that and also creates a presumption of an injury as well. *See, e.g., Chaverri v. Platinum LED Lights LLC*, 2022 U.S. Dist. Lexis 110711, *15 (D. Ariz. 2022) (citing *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 826 (9th Cir. 2011)). Here, the district court dodged the literal falsity analysis in the summary judgment order, but addressed it later on when the Rosette Defendants subbed in a new defendant for the dual purposes of hindering a settlement and moving for attorney's fees. 2-ER-0161-63. But, this strong suggestion by the district court that the advertisement on the Rosette Defendants' website and in its marketing brochures that Mr. Rosette "successfully litigated" the *Pauma* case is indeed literally false

29

is the only correct conclusion. 2-ER-0159-60. It not only interprets the language in accordance with the leading dictionaries, but it also reaches the same understanding as renowned lexicographer Bryan A. Garner, another one of Williams & Cochrane's expert witnesses in this action. 3-ER-0481-97. Thus, with the advertisement at issue being literally false and a proximate cause of the harm suffered, this Court should reverse and remand the decision below and allow Williams & Cochrane to prove its injuries at trial.

## STANDARD OF REVIEW

A grant of summary judgment is reviewed de novo. *See Ikuno v. Yip*, 916 F.2d 306, 308 (9th Cir. 1990). "[V]iewing the evidence in the light most favorable to the nonmoving party," the Court must determine whether "there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000).

## ARGUMENT

I. **THE DISTRICT COURT APPLIED THE WRONG LEGAL STANDARD BY REQUIRING WILLIAMS & COCHRANE TO SHOW PROXIMATE CAUSATION UNDER THE LANHAM ACT'S FALSE ADVERTISING TEST BY PROVING WHAT ACTUALLY HAPPENED WITH SPECIFIC CUSTOMERS RATHER THAN WHAT WAS LIKELY TO HAPPEN IN THE RELEVANT MARKETPLACE MORE GENERALLY**

The ruling by the district court disposing of Williams & Cochrane's false advertising claim under the Lanham Act was that there was a "complete absence of evidence that the Pauma sentence contained in the Rosette Bio caused the Quechan Tribe's decision to replace [Williams & Cochrane]." 1-ER-0036. As put more directly in the subsequent order granting the Rosette Defendants' motion to substitute, the district court was

holding that Williams & Cochrane "ha[d] not established causation on its false advertising claim" by showing that Mr. Rosette's claim that he "successfully litigated" the *Pauma* case to the tune of a $100 million judgment was the actual and sole cause behind Quechan's decision to fire the Firm handling their high-stakes compact dispute and replace it with Mr. Rosette at the final moment. 2-ER-0159-60; *but see REX v. Zillow Inc.*, 2023 U.S. Dist. Lexis 136075, *7 (W.D. Wash. 2023) (explaining "that an injury can have more than one proximate cause" (citing *TrafficSchool.com*, 653 F.3d at 825)). This singular focus on what happened with one particular customer is misplaced, however.

## A. Appropriate Audience

The general test for false advertising under the Lanham Act according to the leading Ninth Circuit precedent is that there must be a false statement in a commercial advertisement that "actually deceived or has the tendency to deceive *a substantial segment of its audience*" and is likely to cause injury "through a direct diversion of sales from [the plaintiff] to defendant or by a lessening of the goodwill associated with its products." *Southland Sod Farms*, 108 F.3d at 1139 (emphasis added). The focus of this analysis is thus upon the marketplace and how this commercial arena would respond to the false statement disseminated by the competing company. This much is confirmed by the next major Ninth Circuit opinion dealing with false advertising under the Lanham Act that explains injury can be addressed "using actual market experience and probable market behavior" since proving a "counterfactual is never easy, and is especially difficult when the injury consists of lost sales that are 'predicated on the independent decisions of

31

third parties; *i.e.*, customers.'" *TrafficSchool.com*, 653 F.3d at 825 (citing, *e.g.*, *Adams v. Watson*, 10 F.3d 915, 923 (1st Cir. 1993)). What this means is that instead of having to obtain evidence from a recalcitrant customer about the actual reasons behind its decision to terminate a relationship, the plaintiff can instead "establish an injury by creating a chain of inferences showing how defendants' false advertising could harm plaintiff's business." *Id.* In other words, the appropriate lens of review is to look at how the relevant market would receive the false advertisement – which, in this case is, again, Mr. Rosette's statement claiming success in the *Pauma* suit that was included both on his website and within all of his marketing materials for the prior six years. 3-ER-0528-54.

## B. Application in Law Firm Cases

Law firm false advertising cases tend to be rare given the cognizance of most attorneys of the ethical rules, but other district courts overseeing such cases have been able to successfully frame the claims around how the marketplace would receive the false representations. One such case is *Bennet v. Zydron*, 2017 U.S. Dist. Lexis 154359 (E.D. Va. 2017), *aff'd by* 2017 U.S. Dist. Lexis 154692 (E.D. Va. 2017), which involved the dissolution of a law firm and the advertisements made by one of the departing partners in the aftermath. There, the parties were principals at a law firm known as "Bennet and Zydron, PLLC," which stopped doing business on January 1, 2016 and resulted in the plaintiff joining with another individual to form the partnership of "Bennet and Sharp" and the defendant going solo and forming the "Zydron Law Firm."

*Id.* at \*3-\*4. After the parting of ways, "the website for the Zydron Law Firm displayed information about verdicts won or settlements [supposedly] reached by the Zydron Law Firm on behalf of plaintiffs in Virginia." *Id.* at \*3. However, all of these cases that dated betweem 2000 to 2015 were actually "originated and handled" by Mr. Zydron's former partner Mr. Bennet during their time together as principles at the prior law firm. *Id.* at \*4. The argument put forward by the defendant to try and get rid of the false advertising claim was that the plaintiff could not show an injury proximately caused by the alleged misappropriation of his successes. *See id.* at \*10. The district court disagreed with this position, however, noting that "defendants falsely traded on Mr. Bennett's work and claimed it as their own," and that "a lawyer's stock-in-trade *is* his or her reputation, and the deceptive or false attribution of credit to another could compromise the reputation of the lawyer who actually provided the services in question." *Id.* at \*12. To the district court it was clear why an attorney would try and break the ethical rules and claim someone else's victories as his or her own: "the entire reason a lawyer would advertise positive case outcomes is to influence the purchasing decision – to convince prospective clients that the lawyer is competent, that he can get good results, and that he has expertise in cases similar to the prospective client." *Id.* at \*22. In other words, common sense dictates that an attorney will use a positive case outcome it advertises in order to get work from a similarly-situated client. With the *Bennett* court finding the legal basis for proximate causation, it was then up to the plaintiff to prove at trial the chain of inferences to show how taking credit for a competitor's victory could cause injury in

33

the relevant marketplace with other similar customers. *See Larry Pitt & Assocs. v. Lundy Law, LLP*, 2013 U.S. Dist. Lexis 174607,\*23 (E.D. Pa. 2013) (explaining a false legal advertisement would influence a consumer's purchasing decision and draw business that would otherwise go to the plaintiff or other law firms).

This same principle was articulated in another attorney false advertising case known as *Brave Law Firm, LLC v. Truck Accident Lawyers Grp., Inc.*, 2019 U.S. Dist. Lexis 79275 (D. Kan. 2019). This case represents the converse of the present situation in which a syndicate of personal injury attorneys ("TALG") disseminated advertisements that they had landed a $9 million settlement (*i.e.*, less than 1/4th of the *Pauma* judgment) and initially obtained a client who had been injured in an automobile accident as a result. *Id.* at \*4. This client – Manhnaz Consolver – only received a settlement offer of $225,000 while being represented by TALG, however, which led her to fire the syndicate and hire the Brave Law Firm instead. *Id.* at \*5. This second law firm stepped in and ultimately settled the matter for $360,000. *Id.* This settlement should have netted Brave an attorney fee of $120,000, but TALG had previously filed an attorney's lien that ended up requiring Brave to redirect $97,101.09 of his earnings to these prior attorneys. *Id.* In the aftermath of this, the head attorney of the Brave Law Firm received a text message that the $9 million settlement advertised by TALG on its website was purely fictitious, as the main defendant "had the case with him" but then "some Texas lawyer" ultimately took it over and settled it for the amount being advertised. *Brave Law Firm, LLC v. Truck Accident Lawyers Grp., Inc.*, No. 17-01156, Dkt. No. 38-12 (D. Kan. July 9, 2018).

34

Litigation ensued, and TALG tried to defend against Brave's false advertising claim by claiming that the plaintiff "did not identify the specific advertisements [its client] Consolver viewed or when she viewed them." *Brave Law Firm, LLC*, 2019 U.S. Dist. Lexis 79275 at *17. To the district court, however, the open question of what one client saw and when it saw it did not invalidate Brave's claim, as the whole crux of the claim was that TALG "exposed potential clients, such as Consolver, to numerous false advertisements over a period of time." *Id.* In other words, the analysis, again, looked at how the relevant marketplace (*i.e.*, personal injury law) would react to an advertisement by a law firm specializing in the field that it achieved a multi-million-dollar outcome in a similar case.

## C. Expert Testimony of Tribal Attorney George Forman

Williams & Cochrane actually submitted two expert reports on this very topic, neither one of which was considered by the district court. The first such report came from a longtime tribal attorney who has worked with tribal councils in California for more than a half-century and can accurately discuss what will influence them given a prevailing legal problem. 3-ER-0498-0511. This individual George Forman is not just some random attorney in the federal Indian law field either; according to his expert report, he was co-counsel in "California v. Cabazon and Morongo Bands of Mission Indians, in which the Supreme Court held," amongst other things, "that P.L. 280 had not given California and other states jurisdiction to enforce their civil/regulatory laws against Indians in Indian Country." 3-ER-0500. After prevailing in that case, he

"participated in legislative efforts to codify the right of tribal governments to operate gaming for governmental purposes," which "culminated in Congress passing and President Reagan signing into law the Indian Gaming Regulatory Act." 3-ER-0500. Following that, he litigated a number of formative cases to reign in state overreach during the compact negotiations required by IGRA, including arguably the first such case of "*Cabazon Band, et al. v. Wilson*," in which the "Ninth Circuit held that the State's jurisdiction to collect [license] fee[s]" in connection with "wagers placed at tribal OTB facilities" "had been preempted by IGRA." 3-ER-0500. Since then, he also litigated the case of "Cachil Dehe Band of Wintun Indians of the Colusa Indian Community v. Schwarzenegger," which served as the foundation for the *Pauma* suit by establishing the misrepresented fact – "that the State had erroneously determined that there were fewer Gaming Device licenses available than the 1999 Compacts actually created." 3-ER-0502; 3-ER-0509. It is also worth noting that since the filing of his expert report, Mr. Forman has prevailed in at least four (4) other suits alleging the State of California negotiated in bad faith with Indian tribes. *See Soboba Band of Luiseno Indians v. California*, No. 20-01147, Dkt. No. 77 (E.D. Cal. Jan. 27, 2023); *Bear River Band of Rohnerville Rancheria v. California*, No. 20-01539, Dkt. No. 86 (E.D. Cal. Jan. 26, 2023); *Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. California*, No. 20-01585, Dkt. No. 79 (E.D. Cal. Jan. 26, 2023); *Cahuilla Band of Indians v. California*, No. 20-01630, Dkt. No. 79 (E.D. Cal. Jan. 26, 2023).

36

Mr. Forman's expert report testifies at length about his credentials and the unique relationship between the tribal attorney and a tribal council, explaining in connection with this latter subject that "tribal leaders tend to take lawyers' representations of their ability and accomplishments at face value." One of the reasons for this, according to Mr. Forman, is that "[i]f… a lawyer claims to have been responsible for a particular court decision, few tribal leaders would have the wherewithal to look up the decision to verify the claimed result, the extent to which the lawyer actually had personal responsibility for that result, and the aftermath of that result." 3-ER-0508. As for the advertisement by Mr. Rosette that he "successfully litigated" the *Pauma* suit to the tune of $100 million, Mr. Forman knew that was untrue largely from his dealings with one of the legal counsel for the tribe – Kevin Cochrane – who had "reached out to [him] for copies of transcripts of the negotiations leading up to the 1999 Compact." 3-ER-0509. Mr. Forman did not believe that your average tribal leader would know the advertisement was literally false, though, which was a big problem given the import of the decision for tribes in California. 3-ER-0508-09; 4-ER-0878-82. This was a belief Mr. Forman made clear at multiple points, including when cross-examined by opposing counsel during his deposition:

> Q: Do you believe that the Pauma compact rescission litigation was very important to California tribes and tribal leaders?
> A: Yes.
> Q: Do you believe it's still very important?
> A: Yes.
> Q: Do you think it was the first time that the State of California was held accountable for its bad faith conduct in compact negotiations with tribes?

> A: No. But it was the first time that the State had to cough up any money.
> Q: Do you believe that the case provided leverage in compact negotiations with the State?
> A: Any tribal victory is going to provide leverage in future dealings between tribes and the State.
> …
> Q: So other than a tribal victory, did other tribes really benefit from the Pauma case?
> A: I think so.
> Q: In what way?
> A: I think it had a chastening effect on the State in future compact negotiations.

4-ER-0874-75. Thus, no matter its characterization, the *Pauma* case was and still is immensely important to tribes looking to resolve disputes under amended gaming compacts or simply negotiate replacement compacts with lower revenue sharing fees. This much should have been evident from Mr. Montague relaying the Sacramento Bee article on the payment of the *Pauma* judgment to the Quechan tribal council in the fall of 2016 and quipping that he hoped his tribe could do the same. 3-ER-0555.

### D. Expert Testimony of Tribal Leader Anthony Miranda

This testimony from Mr. Forman was also echoed by someone on the other side of the attorney/client relationship – a prominent tribal leader who played a vital role in the development of class III gaming in California. 3-ER-0512-20. This second expert witness Anthony Miranda is a Pechanga tribal member who became Chairman of the tribe's economic development corporation in 1992 and started the tribe's gaming operation just three years hence. 3-ER-0513-14. He remained in that position until 2006, by which time Pechanga's casino "was operating over 4,000 electronic gaming

position" and was "the largest gaming facility on the west coast." 3-ER-0514. Not only that, but he also served as the "Chair of the California Nations Indian Gaming Association ('CNIGA')" – an "association of 34 tribes in California… dedicated to the protection of… gaming on tribal lands" – from 2003 to 2009 when the first amended gaming compacts in the State of California came out. 3-ER-0514-16. Due in part to this gaming and policy-making experience, Mr. Miranda was very familiar with the *Pauma* suit, and knew that Mr. Rosette's advertisement about his supposed involvement in such was completely fabricated. 3-ER-0518. However, Mr. Miranda also believed he was far more informed on the subject than the "average tribal member or tribal leader in California," who "would be highly likely to accept at face value a statement on an attorney's website without attempting to independently verify the statement" if for no other reason than "attorneys are [supposed to be] bound by a certain standard of professionalism and ethics" that should prevent them "from publicly taking credit for another attorney's work." 3-ER-0518-19. In line with the prior expert testimony, Mr. Miranda recognized the importance of the *Pauma* case to "California tribes and tribal leaders," seeing it as "a game changer in that it was the first time that the State of California was held accountable for its bad faith conduct in compact negotiations with a tribe in an actual dollar amount, and an incredibly sizeable amount at that." 3-ER-0517. "[G]iven the importance of the *Pauma* case," Mr. Miranda believed "the statement on Mr. Rosette's website would likely be an important factor in a hiring decision for a tribe such as Quechan that, like Pauma, had a Schwarzenegger-era compact requiring

onerously high compact payments." 3-ER-0518. This testimony shows that two different expert witnesses for Williams & Cochrane testified about the likely effect Mr. Rosette's advertisements would have on a gaming tribe in California looking to better its financial position, which in turn means that the Court should reverse and remand the matter so the parties can go to trial on the Lanham Act claim with the appropriate framing.

II. **THE DISTRICT COURT APPLIED THE WRONG LEGAL STANDARD BY ALLOWING THE DEFENDANTS TO SHIELD EVIDENCE OF HOW ONE PARTICULAR CUSTOMER REACTED TO THE FALSE ADVERTISEMENT IN THIS FEDERAL QUESTION CASE ON THE BASIS OF STATE PRIVILEGE LAW**

A. **Appropriate Privilege Law**

Tying proximate causation under federal law to proof of a recalcitrant former customer solely basing its decision to terminate a firm upon a false advertisement while simultaneously allowing said customer to claim privilege of all surrounding evidence on one-hundred-and-eleven-pages of privilege logs not only flies in the face of logic but the law as well. The uniform rule that has existed since long before the inception of this lawsuit is that federal privilege law applies in federal question cases "even where the evidence sought might be relevant to a pendent state claim." *Hancock*, 967 F.2d at 466-67 (collecting cases). The Ninth Circuit does not deviate from this uniform rule, and every party to the litigation realized that and argued in favor of applying federal privilege law to Williams & Cochrane's discovery dispute regarding the Rosette Defendants' plan

to produce approximately thirty documents while suppressing more than twelve-hundred others:

> The Court: … My first question to those – to all of you, though, is it seems as though the parties were applying federal privilege law. I am basing my rulings on California privilege law, unless I am mistaken. And is there any reason that both of you wish to tell me that I am mistaken in applying California privilege law, or why you believe federal privilege law would apply?

> Mr. Cochrane: … There was a 2005 case from the Ninth Circuit called *Agster v. Maricopa County* [422 F.3d 836], and it sort of dealt with the situation in which you ha[ve] a federal question claim that was joined with other pend[ent] state law claims, and I believe they held in that situation that the federal law [of] privilege applies. Usually, in that situation, what happens is you will look at federal common law [of] privilege. State law can sort of serve [in] a gap-filling capacity if it's instructive in some way, but I think that we are probably more comfortable with federal law applying, first and foremost.

1-ER-0072. Yet, this uncontested argument that the Ninth Circuit's binding opinion in

*Agster v. Maricopa County* requires the application of federal privilege law in federal

question cases did not sway the magistrate judge, as he immediately ruled that he would

apply California privilege law and only find a waiver if provided for in a "statutory

source under California Evidence Code 900, *et seq.*" 1-ER-0073; *see Agster*, 422 F.3d at

839. The objections to this ruling that Williams & Cochrane filed with District Judge

Curiel did not produce a different outcome despite the order denying the motion for

reconsideration conversely noting that "[a] a majority of federal courts have applied

federal privilege law to claims of privilege in federal question actions with pendent state

law claims." To District Judge Curiel, "frankly, the law [of privilege] in this context [of

41

a federal question case with pendent state law claims] is unclear and courts have adopted a multiplicity of approaches," thus leading him to accept the one taken by the magistrate judge of applying state privilege law to a federal claim. 1-ER-0059-61.

### B. Subsequent District of Arizona Order

What is most notable about this order is just how much it departs from everything that has come out since – with all of those orders finding no uncertainty and adopting the same approach that federal privilege law applies in federal question cases. Arguably, the first of these orders actually arose in this case as well, when Williams & Cochrane moved to compel a third-party subpoena in the United States District Court for the District of Arizona just over a month after District Judge Curiel released his order finding state privilege law applied. *See REDW, LLC*, 2020 U.S. Dist. Lexis 138296 (D. Ariz. 2020). The third-party accounting firm employed by Quechan at the center of that enforcement action tried to deflect responding to the subpoena by arguing that it need not comply in light of the State of Arizona's accountant privilege – a privilege that does not exist under federal law. *See id.* at *8. District Judge Susan Brnovich was suddenly tasked with deciphering the very muddled situation of whether federal, California, or Arizona privilege law would apply to resolve the prevailing dispute. *Id.* However, the analysis in the resultant order began precisely where it did before the Southern District of California: with a discussion of *Agster* and how the Ninth Circuit had already held that "[w]here there are federal question claims and pendent state law claims present, the federal law of privilege applies." *Id.* at *9. The accounting firm that had advocated for

42

the application of Arizona privilege law then made a last-minute switch to arguing in favor of California privilege law since all the claims directed at its client in the underlying litigation were premised on law from that jurisdiction. *Id.* at *13. However, this argument that applicable privilege law was separable if the federal question claim was directed at one party while the pendent claims another did not gain any traction with District Judge Brnovich. *Id.* Even though she did not "handl[e] the underlying litigation," District Judge Brnovich was still able to discern that "the Southern District of California's original subject matter jurisdiction depends entirely on federal question jurisdiction," which meant it must have found that any pendent state law "claims… are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." *Id.* (citing 28 U.S.C. § 1367(a)). The claims were not divisible, in other words, which meant that "the discovery sought here must in some way concern both [sets of] claims" and the "federal privilege law" should apply. *Id.* at *13-*14.

## C. Subsequent Southern District of California Order

The order issued by District Judge Brnovich is very nuanced and thorough, affording much more attention to the issue of the appropriate body of privilege law to apply in federal question cases than those from other courts that would follow. In fact, the Southern District of California dealt with that issue just three months later in a case involving a subpoena issued to a party's former general counsel in the hopes of eliciting testimony that would defeat a pending motion to disqualify. *See EpicentRx*, 2020 U.S.

Dist. Lexis 195231 at *1. There, the discussion in the order about the contours of compliance with the subpoena actually begins by twice citing District Judge Curiel's order to establish that "the jurisdictional basis of an action will generally determine whether a district court will apply federal or state privilege law to the parties' claims of privilege," and "[a] majority of federal courts have applied federal privilege law to claims of privilege in federal question actions with pendent state law claims." *Id.* at *10. Despite facing a situation where subpoena enforcement could implicate attorney-client privilege concerns, the Southern District of California nevertheless "follow[ed] the majority approach" rather than the unorthodox one taken by District Judge Curiel in the very order cited for the rules of decision, noting that jurisdiction over the pending matter arose primarily from the federally-based "Defend Trade Secrets Act and Electronic Communications Privacy Act" even though the court also exercised "supplemental jurisdiction over Plaintiff's remaining state law claims." *Id.* at *10.

### D. Subsequent Orders from Other Ninth Circuit Courts

The orders in *REDW LLC* and *EpicentRx* may have been some of the first few to subsequently address the federal-vs.-state privilege law issue in federal question cases, but they certainly were not the last. A slew of orders on the subject have come out in the three years since, and seemingly every single one follows the rule in *Agster* that predates the inception of this suit of federal privilege law applying in federal question cases even if pendent state law claims are present. *See Swan v. Miss Beau Mode, Inc.*, 566 F. Supp. 3d 1048, 1052 n.2 (D. Or. 2021) (noting "it would also be impracticable to

apply two different rules of privilege to the same evidence before a single jury" (citation omitted)); *Southern Cal. Hous. Rights Ctr. v. K3 Holdings, LLC*, 2022 U.S. Dist. Lexis 219198, *7, *22 (C.D. Cal. 2022) (applying federal privilege law in a racial discrimination case under the Fair Housing Act despite thirteen pendent state law claims ranging from substandard housing conditions to unlawful construction); *Conyers v. Cano*, 2020 U.S. Dist. Lexis 246995, *10-*11 (C.D. Cal. 2020) (applying federal privilege law in a federal question case to evidence that related solely to state-law counterclaims); *accord, e.g., Wisk Aero. LLC v. Archer Aviation, Inc.*, 2023 U.S. Dist. Lexis 103780, *12 (N.D. Cal. 2023); *Hajihassani v. Encore Flight Corp.*, 2023 U.S. Dist. Lexis 30700, *10 (C.D. Cal. 2023); *Olfati v. City of Sacramento*, 2023 U.S. Dist. Lexis 22201, *6 (E.D. Cal. 2023); *Mascarenas v. Boyd*, 2023 U.S. Dist. Lexis 15601, *14 (C.D. Cal. 2023); *Garcia v. County of Stanislaud*, 2022 U.S. Dist. Lexis 166453, *46 (E.D. Cal. 2022); *Skye Orthobiologics, LLC v. CTM Biomedical, LLC*, 2022 U.S. Dist. Lexis 141060, *10 (C.D. Cal. 2022); *Clark v. City of Los Angeles*, 2021 U.S. Dist. Lexis 199185, *24-*25 (C.D. Cal. 2021); *Sweet v. City of Mesa*, 2022 U.S. Dist. Lexis 19848, *3 (D. Ariz. 2022); *Burke v. Basil*, 2021 U.S. Dist. Lexis 227534, *10 (C.D. Cal. 2021); *Perez v. DirecTV Grp. Holdings*, 2020 U.S. Dist. Lexis 259346, *3 (C.D. Cal. 2020); *Fisher & Paykel Healthcare, Ltd. v. Flexicare Inc.*, 2020 U.S. Dist. Lexis 210910, *2 (C.D. Cal. 2020). And yet, the district court departed from binding precedent, the wishes of the parties, and all of these other cases by strictly applying California privilege law to a federal false advertising claim in which the direct or circumstantial evidence about the actual communication of the statement at issue – on top of the online and

45

print advertisements that admittedly existed and were designed to target such customers – could have arisen at any point either before or during Mr. Rosette's brief tenure representing Quechan in the compact negotiations. 1-ER-0050-68. Given this, the Court should reverse the order below and remand this case to the district court with instructions to analyze the privilege logs in light of federal privilege law so the case can proceed to trial without delay.

### III. THE DISTRICT COURT COMMITTED A LEGAL ERROR BY ADDRESSING CAUSATION WITHOUT FIRST CONSIDERING THE VERACITY OF THE ADVERTISEMENT AT ISSUE SO AS TO AVOID APPLYING THE PRESUMPTION FRAMEWORK OF THE LANHAM ACT

Regardless of the appropriate audience, one overarching error is that the district court concluded it did not need to consider the contents of the statement – including the veracity of such – before deciding whether it was the actual cause of harm. 1-ER-0040. The discussion on this point delved into differentiating between a burden of persuasion and a burden of production, explaining that Williams & Cochrane always had the former so any shift in the latter mandated by the Lanham Act would have been of no consequence. 1-ER-0041. In other words, a burden of production is really no burden at all, as it had been read right out of the Lanham Act.

### A. Appropriate Presumptions

It is important to remember that the Lanham Act is "at its heart a consumer protection statute" designed to protect the susceptible from what they may not otherwise know, meaning its power to redress harm is inherently tied to the size of the

46

whopper a competitor puts forward. *See TrafficSchool.com*, 653 F.3d at 827 (citing, *e.g.*, *U-Haul Int'l, Inc. v. Jartran, Inc.*, 681 F.2d 1159, 1162 (9th Cir. 1982)). Consider for instance an aging Vietnam veteran in need of legal assistance to redress an incurable malignancy that laid dormant for decades following his service. There's a significant difference between a tangential and misleading advertisement by an attorney claiming he helped settle a hypothetical case against Carnival Cruise Line for $10,000 on behalf of a customer who caught Legionnaires' Disease on the one hand, and a literally false one claiming he was the lead attorney who "successfully litigated" the Agent Orange Product Liability Litigation to the tune of a $180 million settlement on the other. A competing law firm that lost out on the chance to represent this Vietnam veteran would understandably have a hard time making out a case that it was harmed if it turned out that the settlement in the Carnival Cruise Line matter was primarily a result of the passenger being stranded at sea on the Diamond Princess during the early days of the COVID-19 pandemic. It should not, however, face any difficulty holding the direct competitor responsible for taking credit for a momentous victory in the field that he or she did not actually earn.

This goes to show why the Ninth Circuit has a burden-shifting methodology in place for addressing false advertising claims under the Lanham Act that begins with looking at the truth or falsity of the statement at issue. If the advertisement is just literally false, that in turn raises presumptions of materiality and deception. *Southland Sod Farms*, 108 F.3d at 1140; *Warner Cable, Inc. v. DirecTV, Inc.*, 497 F.3d 144, 158 (2d Cir. 2007) (finding

that a message is literally false also means that "no extrinsic evidence of consumer confusion is required"). However, if this literally false advertisement is put forward by a direct competitor within a specific market, that situation keeps with the hypothetical discussed above by also creating a presumption of competitive injury as well. *See TrafficSchool.com*, 653 F.3d at 826-2; *ThermoLife Int'l, LLC v. Gaspari Nutrition Inc.*, 648 F. App'x 609, 616 (9th Cir. 2016) (explaining the holding in *TrafficSchool.com* "permits a jury to infer injury based on evidence of direct competition (which provides a causal link) and a likelihood of consumer deception"). Thus, a competing law firm within the federal Indian law field that put out a false advertisement targeted at this particular field must be aware that a finding of literal falsity is just the first domino to fall, with it knocking over the ones for materiality, causation, and injury also.

## B. Expert Testimony of Grammarian/Legal Lexicographer Bryan A. Garner

The after-the-fact insinuation by the district court that the advertisement made by the Rosette Defendants was, indeed, literally false not only should have completely changed the complexion of summary judgment, but it would have aligned with the testimony from one of Williams & Cochrane's expert witnesses during this process. 2-ER-0159-60; 3-ER-0481-97. Though he likely does not need an introduction, that expert Bryan A. Garner is the world renowned "lawyer, law professor, grammarian, and legal lexicographer" responsible for authoring Garner's Modern English Usage and serving as the editor in chief of the five most recent unabridged editions of Black's Law Dictionary. 3-ER-0481. Mr. Garner was tasked with using his expertise to consider

48

"whether Mr. Rosette's statements that he 'successfully litigated' the Pauma Band case and that he 'save[ed] the [client] over $100 million in Compact payments' are literally true or false, and whether they are misleading." 3-ER-0483. The only possible saving grace for this statement was the fact that the *Pauma* case was in the custody of his firm – albeit handled by Cheryl Williams and Kevin Cochrane – for a brief nine-month period at the outset. *See Pauma I*, Dkt. No. 1 (S.D. Cal. Sept. 4, 2009). Yet, even affording Mr. Rosette every conceivable benefit of the doubt, this firm's final act following Ms. Williams and Mr. Cochrane's departures was filing the ineffective opposition brief with the Ninth Circuit on the State of California's motion to stay the preliminary injunction, thus leaving "[h]is client [] in no better position, and arguably in a worse position, than when the original suit was filed." 3-ER-0484; *see Pauma II*, Dkt. No. 14 (9th Cir. June 10, 2010). This much is evident by the State of California then sending notices to Pauma demanding full and immediate payment of the revenue sharing fees forestalled by the injunction under threat of compact termination. *See Pauma II,* Dkt. No. 51 (9th Cir. Aug. 17, 2010). Williams & Cochrane was not only responsible for getting that injunction back in place, but – as Mr. Garner noted – it also "amended the complaint in September 2011, adding to it a claim that became the sole theory on which the Pauma Band ultimately prevailed some five years later – as a result of which the State of California was ordered to pay the tribe $36.2 million as restitution." 3-ER-0484. Being the attorneys who were actually present and responsible for handling the case at the point of victory was pretty key to Mr. Garner in interpreting the meaning of "successfully

litigated," as he eloquently pointed out that a lot can happen between the starting and finish lines:

> Any lawsuit involves complexities in responding to the opponent's maneuverings, especially when the financial stakes are high. Cases can be won or lost on procedural points as well as substantive ones. Discovery can be time-consuming and burdensome, and it can take unexpected turns. Deadlines come and go. Impressions that counsel make on the court, based on stances taken, can have an enduring effect on the decision-maker.

3-ER-0484-85.

Thus, the legal profession like the music industry and most other walks of life (see: The Beatles original bassist Stuart Sutcliffe) does not reward someone who was simply present in the beginning by allowing them to take credit for accomplishments that happened afterwards, a principle that also becomes evident if one approaches Mr. Rosette's advertisement from a purely grammatical perspective by parsing its text. The recommended unabridged dictionary that "every self-respecting writer ought to own" according to Mr. Garner is the third and most recent edition of Webster's New Intentional Dictionary. *See Univ. of Del. v. New Castle County*, 2003 Del. Super. Lexis 27, *27 n.58 (2003) (citing Bryan A. Garner, *The Elements of Legal Style* 99-100 (2d ed. 2002)). That dictionary defines the term "litigate" as to "prosecute or defend by pleadings, evidence, and debate in a court" (*see* Webster's New Int'l Dictionary 1322 (3d. ed. 2002)), which in turn means "successfully litigating" *something* requires an attorney to prevail in debating such thing on the pleadings and evidence. If that something turns out to be a full "case," an attorney who successfully litigates that to the tune of a $100

50

million outcome for his or her client would need to be the advocate responsible for obtaining the favorable judgment. Irrefutable proof that Mr. Rosette is *not* that person comes from the federal court dockets for the *Pauma* litigation, which Williams & Cochrane respectfully requests that the Court judicially notice. *See Porter v. Ollison*, 620 F.3d 952, 955 n.1 (9th Cir. 2010) (taking judicial notice of court dockets not considered by district court).

## IV.  WILLIAMS & COCHRANE REQUESTS THE MERITS PANEL TO RETAIN JURIS-DICTION OVER ANY SUBSEQUENT PETITIONS OR APPEALS

Reaching the point where the district court issued an order related to the merits of a straightforward false advertising claim under the Lanham Act took five-plus years and four transfers, and, even then, it still only involved one element of the test. Any future issues between now and the time of trial – including procedural irregularities – will threaten to propel this case into its second decade of existence. As such, Williams & Cochrane respectfully requests that the merits panel retain jurisdiction over any future petitions or appeals in this matter.

## CONCLUSION

For the foregoing reasons, Williams & Cochrane respectfully requests that the Court reverse the summary judgment order below as to the Lanham Act claim and remand the case for trial.

RESPECTFULLY SUBMITTED this 16th day of August, 2023

By: /s/ *Kevin M. Cochrane*
Cheryl A. Williams

51

Kevin M. Cochrane
Williams & Cochrane, LLP
28581 Old Town Front Street
Temecula, California 92590
T/F: (619) 793-4809
*Attorneys for Plaintiff & Appellant*
*Williams & Cochrane, LLP*

Michelle Carr
38 S. Meredith Ave., No. 3
Pasadena, California 91106
T: (619) 772-0655
*Attorney for Plaintiff & Appellant*
*Williams & Cochrane, LLP*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 23-55166

I am the attorney or self-represented party.

**This brief contains** 13,747 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

(●) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  [ ] it is a joint brief submitted by separately represented parties.
  [ ] a party or parties are filing a single brief in response to multiple briefs.
  [ ] a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated [              ].

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Kevin M. Cochrane **Date** 8-16-2023
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** *Rev. 12/01/22*